Darryl COVINGTON, et al., Plaintiffs,

v.

DISTRICT OF COLUMBIA,
et al., Defendants.

Civ. A. No. 87–2658 (RCL).

United States District Court,
District of Columbia.

Dec. 13, 1993.

Michael J. Gaffney, Daniel M. Schember, Gaffney & Schember, P.C., Washington, DC, for plaintiffs.

Michael E. Zielinski, Asst. Deputy Corp. Counsel Civ. Div., Washington, DC, for defendants.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This case comes before this court on plaintiffs' motion for an award of attorney's fees under 42 U.S.C. § 1988, the Civil Rights Attorney's Fee Awards Act of 1976. Having considered the extensive pleadings and evidence of both parties, this court shall grant plaintiffs' motion.

## I. BACKGROUND

The case underlying this attorney's fee litigation was brought by ten inmates of the District of Columbia's correctional facility at Lorton. The inmates alleged that while shackled and handcuffed, they were severely beaten by correctional officers in October 1986. Nine of the inmates further alleged that prison authorities found them guilty of misconduct and sent them to a maximum security facility without proper hearings.

The inmates, who could not afford legal fees, were represented by counsel who took their case on a contingent fee basis. Mr. Daniel Schember and Mr. Michael J. Gaffney of the law firm of Gaffney & Schmeber, P.C., were lead counsel for plaintiffs. They were aided by Ms. Linda Delaney, a solo practitioner who participated in discovery, trial preparation and trial; Professor Mark Hager, a professor at American University's Washington College of Law who researched legal questions and identified and interviewed witnesses; Georgetown University Law Center graduates Mr. Darryl Joe and Ms. Tess Ferrera; and law students from American University's Washington College of Law who worked under Mr. Schember's supervision.[1]

Plaintiffs' counsel handled very well this complicated federal case, which involved the constitutional claims of ten plaintiffs against sixteen defendants, lengthy discovery, many motions and a jury trial. Counsel won partial summary judgment for the nine plaintiffs sent to the maximum security facility, won judicial sanctions against defendants for their failure to respond to requests for admissions and related interrogatories, and took full advantage of certain key facts that defendants were forced to concede. After trial, the jury found for all plaintiffs against all defendants on all issues tried.

After the court denied defendants' motion for judgment notwithstanding the verdict, defendants appealed. The parties settled while the appeal was pending. Under the settlement, defendants paid each plaintiff $25,000 and conceded that plaintiffs were prevailing parties for the purposes of § 1988.

After settling the underlying litigation, the parties negotiated an interim agreement on attorney's fees, approved by this court by an Agreed Order dated December 20, 1991. In the Agreed Order, the parties stipulated as to the number of hours plaintiffs' counsel reasonably spent on the case, and settled

---

**1.** Plaintiffs are not seeking compensation for the work of Mr. Tom Mack, a lawyer then from the firm of Lyons, Mack & Delaney, even though he helped try *Covington*. Mr. Mack's time was traded off in fee negotiations with defendants.

plaintiffs' claim for legal expenses incurred up to the date of the Agreed Order.

The parties did not resolve, however, the hourly rates at which counsel should be compensated. Under the Agreed Order, counsel accepted $125–150 per hour—the rates plaintiffs' counsel ordinarily charged paying clients[2]—from defendants for the interim, without conceding that that rate was all that was due. Also unresolved in the Agreed Order was whether defendants must compensate plaintiffs for the market value of the hours reasonably expended by the law students.

The Agreed Order stayed further proceedings in this case pending the Supreme Court's resolution of the issue of contingency fee enhancements.[3] Because the Supreme Court has since resolved that issue in *City of Burlington v. Dague*, —— U.S. ——, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992), plaintiffs now seek a final award of attorney's fees.

The issue now before this court is the amount of attorney's fees to which counsel are entitled. Specifically, this court must decide what the reasonable hourly rate for plaintiffs' counsels' legal services is, whether plaintiffs may recover fees for the stipulated time of the law students who worked on this case, whether plaintiffs should receive current or historic rates, and whether plaintiffs are entitled to fees for this fee litigation.

## II. ATTORNEY'S FEES

### A. Counsel

#### 1. Reasonable Hourly Rate

The most difficult issue in this case is establishing the reasonable hourly rate. In § 1988 cases, "[t]he initial estimate of a reasonable attorney's fee"—the so-called lodestar fee—"is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate. Adjustments to that fee then may be

made as necessary in the particular case." *Blum v. Stenson*, 465 U.S. 886, 888, 104 S.Ct. 1541, 1543, 79 L.Ed.2d 891 (1984) (citations omitted). The parties in this case have already stipulated as to the number of hours counsel have reasonably worked on this litigation, and plaintiffs are not seeking any enhancement of the lodestar figure. Thus, the central contested issue in this case is the calculation of a reasonable hourly rate.

■ Calculating the reasonable hourly rate of lawyers in purely commercial law firms is relatively easy. The reasonable hourly rate of lawyers in purely commercial law firms is presumed to be the rate such lawyers charge paying clients for similar services, within certain parameters. *See Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4, 24–25 (D.C.Cir.1984), *overruled in part on other grounds, Save Our Cumberland Mountains, Inc. v. Hodel [SOCM]*, 857 F.2d 1516, 1520 (D.C.Cir.1988) (*en banc*). Calculating the reasonable hourly rate of lawyers who lack established billing histories is more difficult. Lawyers working in private legal aid organizations, for example, often do not receive fees for their legal work and thus necessarily lack any billing history that could serve as their presumptively reasonable rate; for them, a district court must determine the "prevailing market rates in the relevant community," and award counsel that as the reasonable hourly rate. *Blum*, 465 U.S. at 895, 104 S.Ct. at 1547. In the D.C. Circuit, this latter method of calculation is also used to determine the attorney's fees owed to "privately practicing but public interest motivated attorneys who intentionally charge their poorer clients reduced rates." *SOCM*, 857 F.2d at 1520.

Plaintiffs' counsel argue that they are privately practicing attorneys who charge some of their poorer clients reduced rates out of public interest motives, and defendants have

---

**2.** The rate Prof. Hager received under the Agreed Order is an exception. Because Prof. Hager lacks any billing history, his $150 per hour interim rate was reached by negotiations between the parties.

**3.** At the time of the Agreed Order, a petition for writ of certiorari in *King v. Palmer*, 950 F.2d 771 (D.C.Cir.1991) (*en banc*) (denying contingency fee enhancements), was pending in the Supreme Court. The Supreme Court has since denied certiorari. *See King v. Ridley*, —— U.S. ——, 112 S.Ct. 3054, 120 L.Ed.2d 920 (1992).

failed to disprove that.[4] Defendants have not challenged plaintiffs' declarations showing that Gaffney & Schember, P.C., has a history of handling civil rights and civil liberties cases either without charge or at "below-market rates" for non-economic reasons. Nor have defendants countered plaintiffs' evidence that Ms. Delaney similarly charges reduced rates for her legal work out of public interest motives. Most significantly, defendants have not produced enough evidence to show that plaintiffs' counsels' ordinary billing rates—about $150 per hour—are not below market value. (This failure is discussed below.) Because plaintiffs' assertions that their counsel have taken public interest cases for below-market rates are reasonably well-documented and virtually unchallenged, this court will take plaintiffs at their word. As public interest but private practice lawyers, plaintiffs' counsel are entitled to receive prevailing market rates for their services. *See SOCM*, 857 F.2d at 1524.

### a. Definition of the Relevant Market

As public interest but private practice lawyers, plaintiffs' counsel are clearly entitled to the rates "prevailing in the *relevant* market, *i.e.*, 'in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" *Missouri v. Jenkins*, 491 U.S. 274, 286, 109 S.Ct. 2463, 2470, 105 L.Ed.2d 229 (1989) (quoting *Blum*, 465 U.S. at 896 n. 11, 104 S.Ct. at 1547 n. 11) (emphasis added). However, the parties disagree as

to which market of legal services is the "relevant market" in this case.

Defendants argue that the relevant market should be narrowly defined as that market of lawyers who represent plaintiffs in civil rights, employment, or discrimination actions. According to defendants, plaintiffs' counsel are entitled to no more than the (allegedly low) fees prevailing in this narrowly defined sub-market of legal services.

Plaintiffs, by contrast, argue that the relevant market should be more broadly defined as the market of lawyers who handle all kinds of complicated federal litigation. This broader market encompasses every complicated federal case handled by District of Columbia lawyers, including not only the small sub-market of lawyers who file civil rights, discrimination, or employment suits but also the sub-market of lawyers who litigate antitrust matters, the sub-market of lawyers who file and defend class actions, etc. Plaintiffs argue that they are entitled to the high fees commanded by lawyers in this broader market.

■ Defendants' position may be plausible. Although no District of Columbia federal court appears to have spoken squarely on the issue of sub-markets, the legislative history of § 1988[5] and subsequent Supreme Court[6] and District of Columbia circuit[7] caselaw construing attorney's fee statutes make clear that in resolving any particular attorney's fee question under § 1988 (includ-

---

4. Instead of contesting the public interest orientation of Gaffney & Schember, P.C., or any of plaintiffs' other legal advisors, defendants have challenged the wisdom of the *SOCM* court's *en banc* decision to trust district courts to weigh the credibility of a fee applicant's affidavit of public interest motivation.

5. Senate Report No. 94–1011 (1976) U.S.Code Cong. & Admin.News 1976, 5908, indicates that in enacting § 1988, Congress intended attorney fee awards to reflect the prevailing rates that counsel could have earned in the legal market. *See Blum*, 465 U.S. at 893, 104 S.Ct. at 1546 (citing S.Rep. No. 94–1011, p. 6 (1976)).

6. In calculating attorney's fees under § 1988, the Supreme Court has "consistently looked to the marketplace as [its] guide to what is 'reasonable.'" *Jenkins*, 491 U.S. at 286, 109 S.Ct. at 2470.

7. The District of Columbia Circuit has long recognized that under fee-shifting statutes, attorneys should be compensated "for the market value of services rendered." *Copeland v. Marshall*, 641 F.2d 880, 894 (D.C.Cir.1980) (*en banc*).

Further, some District of Columbia caselaw appears to support defendants' sub-market theory more specifically. The *Copeland* court held that the reasonable hourly rate to be awarded under fee-shifting statutes is the rate "prevailing in the community *for similar work*." *Copeland*, 641 F.2d at 892 (emphasis added). *See also SOCM*, 857 F.2d at 1521 (finding congressional intent to award "rates commensurate with prevailing community standards of attorneys of like expertise *doing the same sort of work in the same area*.") (emphasis added).

ing this sub-market question), courts must aim to award attorney's fees that mirror what counsel would earn in the market. If the market would provide different sub-markets [8] of lawyers different rates, courts properly aiming to mirror the market would award lawyers in each sub-market the fees that their particular services command in the marketplace.

However plausible defendants' theory may be, ruling on its merits will have to wait for another, better litigated case. Defendants have not produced enough evidence in this case to persuade this court that the prevailing rate in the sub-market of plaintiffs' lawyers handling civil rights, employment, and discrimination cases is—as defendants claim—lower than the rate prevailing in the broader legal market. Without this evidence, embracing defendants' theory would be mere dicta since this court could not have applied defendants' theory to this case. Perhaps this court will have the chance to reconsider defendants' theory in a future case in which the party opposing fees produces a more thorough evidentiary record.

Unlike defendants, plaintiffs in this case have presented sufficiently persuasive evidence charting the prevailing market rates of litigators of complex federal matters. Plaintiffs' chief evidence is a pair of court-approved matrices. The first of these matrices is an updated *Laffey* fee matrix that has been relied upon, at least in part, by six District of Columbia district judges [9] and that has received a degree of approval from the Court of Appeals for the District of Columbia Circuit.[10] The second matrix is one developed by the U.S. Attorney's Office for the District of Columbia that the U.S. Attorney relies upon in settlements.[11] Defendants' blunderbuss criticisms of plaintiffs' matrices—as representing only a small percentage of the District of Columbia's Bar, and as omitting the "lower end of the market" of legal services—may have merit, but standing alone these criticisms are insufficient to undermine plaintiffs' evidence. *See Nat. Ass'n of Concerned Vets. v. Sec. of Defense*, 675 F.2d 1319, 1337–38 (D.C.Cir.1982) (Tamm, J., concurring).

For their own part, defendants have not presented persuasive evidence that the fees earned by plaintiffs' lawyers in the sub-market of civil rights, employment, and discrimination litigation are lower than the fees earned in the broader market of complicated federal litigation. Defendants' sole affidavit, sworn by Michael E. Zielinski, Assistant Deputy Corporation Counsel, Civil Division (Defs.' Opp'n Ex. B), offers insufficient evidence of this contention. For example, to challenge the rates of plaintiffs' lead counsel, Zielinski's affidavit cites only seven instances in which lawyers with 10–20 years of experience charged about $150 per hour in representing plaintiffs in civil rights, employment, or discrimination matters. Standing alone, these seven instances are insufficient to demonstrate that $150 per hour is the prevailing rate across the District of Columbia in this sub-market. *See Concerned Veterans*, 675

---

**8.** Defendants have not convinced this court that lawyers handling civil rights, employment, or discrimination cases for plaintiffs constitute a sub-market of their own. Perhaps a better defined sub-market would include lawyers handling civil rights, employment, or discrimination cases for private defendants, as well.

**9.** *See Fischbach v. District of Columbia*, CV 87–646 (D.D.C. Jan. 4, 1993) (Penn, J.); *Robles v. United States*, CV 84–3635 (D.D.C. Jan. 10, 1992) (Flannery, J.); *Trout v. Ball*, 705 F.Supp. 705, 709 n. 10 (D.D.C.1989) (Harold Greene, J.); *Palmer v. Barry*, 704 F.Supp. 296, 298 (D.D.C. 1989) (Oberdorfer, J.); *Thompson v. Barrett*, 599 F.Supp. 806, 814 (D.D.C.1984) (Richey, J.); *Laffey v. Northwest Airlines, Inc.*, 572 F.Supp. 354, 371–75 (D.D.C.1983) (Robinson, J.), *aff'd*, 746 F.2d 4 (D.C.Cir.1984), *rev'd on other grounds*, SOCM.

**10.** *See SOCM*, 857 F.2d at 1525 (commending use of *Laffey* matrix). *See also Goos v. National Association of Realtors*, 997 F.2d 1565, 1568 (D.C.Cir.1993) (*dicta* implying that the *Laffey* matrix is "the schedule (or matrix) of prevailing community rates [that has been] adopted in this circuit.").

The *Laffey* matrix is set forth in Appendix A.

**11.** In the joint stipulation of settlement in *Hodge v. Kemp*, CV 92–1183 (SS) (May 18, 1992) (Pls.' Ex. 27 at ¶ 3), defendants—who were represented by the U.S. Attorney's Office—stated that the U.S. Attorney's Office's matrix sets forth the "prevailing rates in this community."

The matrix prepared by the United States Attorney's Office is set forth in Appendix B.

F.2d at 1325 (parties opposing fee awards have burden of rebutting evidence favoring high fees with "equally specific countervailing evidence.... tending to show that a lower rate would be appropriate."). *See also id.* at 1337–38 (Tamm, J., concurring). These seven instances look suspiciously representative of only the lower end of the sub-market. Just because some lawyers are willing to take some civil rights, employment, or discrimination cases at low-end rates of $125 to $150 per hour, does not establish $125 to $150 per hour as the prevailing market rate for the entire sub-market. Defendants have failed to proffer evidence of the high end, as well as the low end, of the range of rates commanded by very experienced counsel in their proposed sub-market.

Defendants' evidence of the rates of those who aided lead counsel in *Covington* is no more persuasive. To establish the prevailing market rates of Ms. Delaney and Prof. Hager, both lawyers of 4–7 years experience, defendants' evidence consists of a single billing rate: Ms. Delaney's. This court cannot assume that a single attorney's billing rate happens to equal the rate prevailing for the work of similar attorneys in the city-wide sub-market of civil rights, employment, and discrimination cases. To establish the prevailing market rates of plaintiffs' counsels' law graduates, Mr. Joe and Ms. Ferrera, defendants point only to one District of Columbia firm that billed its paralegals at $20 per hour (Zielinski Decl. at ¶11) and to another District of Columbia firm—Gaffney & Schember—that billed its law graduates' time at $40 per hour. Again, these two instances are insufficient evidence that across the District of Columbia the prevailing market rate for law graduates' work in defendants' proposed sub-market is $20–40 per hour.

In future cases, parties opposing fee awards might come forward with more persuasive evidence. A *statistically reliable, well-documented, and extensive survey of the rates clients pay for a certain sub-market of legal services* would be powerfully persuasive. Such a survey would collect the rates of a statistically significant number of lawyers or firms within a legal sub-market, con-

vincing the court that the survey's scope is broad enough to reflect the market faithfully. Such a survey would be sufficiently documented with supporting affidavits, assuring the court of the accuracy of the survey's data. Lastly, such a survey would encompass both the high rates that large, prestigious law firms in the area command for their work in the sub-market and the lower rates commanded by others for their work in the sub-market. (Ideally, the survey would also indicate what fraction of clients pay which rates within the sub-market's rate spectrum. That is, the survey would state what fraction of the sub-market's clients take their cases to high-priced firms, what fraction to low-priced firms, and what fraction to firms priced in the middle. This would help the court determine whether any given rate is typical or aberrant.)

Parties seeking fees for legal services performed in a lucrative sub-market—in the antitrust sub-market, for example—might proffer a statistically reliable, well-documented, and extensive survey of that sub-market's rates in order to show that in the marketplace, their counsels' work commands high fees. Parties opposing excessive fee awards for work performed in a less lucrative sub-market might proffer a statistically reliable, well-documented, and extensive survey of that sub-market's rates to establish that in the marketplace, counsel would have commanded only a modest fee.

In the present case, however, the record is too meager; defendants have simply not produced enough evidence that the prevailing market rate for the proposed sub-market of plaintiffs' civil rights, employment, and discrimination lawyers is only $150 per hour. Because defendants have not carried their evidentiary burden, this court cannot rule for defendants. Because this court cannot rule for defendants, for today plaintiffs' theory that the relevant market should be very broadly defined still stands. Because plaintiffs have met their evidentiary burden under that theory—and because defendants' factual rebuttal of plaintiffs' evidence has been ineffectual—plaintiffs shall be awarded the prevailing market rates for their services in the broadly defined market of complicated

federal litigation. This court now turns to the determination of those rates.

#### b. *Prevailing Market Rates for Complicated Federal Litigation*

■ In performing the difficult task of calculating the prevailing market rates for attorney's fees, this court by necessity relies upon the evidence of the prevailing market rates that the parties have produced. *Cf. Concerned Veterans*, 675 F.2d at 1323–24 (noting that attorney's fee cases impose a "difficult burden" on a district court and "correspondingly heavy" evidentiary burdens on fee applicants). In the present case, only plaintiffs have produced sufficient evidence of the prevailing market rates; defendants have produced little persuasive countervailing evidence. In future cases, this court hopes to base its calculations on statistically reliable, well-documented, and extensively surveyed evidence of the sort described above. In the meantime, this court is forced to rely solely upon plaintiffs' unrebutted evidence.

#### i. *Mr. Gaffney and Mr. Schember*

The *Laffey* fee matrix and the U.S. Attorney's Office's matrix both award the same 1992–93 rate—$260 per hour—to lawyers with Mr. Gaffney's and Mr. Schember's 11–19 years of experience. The *Laffey* matrix charts fees only up to 1988–89 (*see* Appendix A), but plaintiffs have updated the *Laffey* matrix's 1988–89 rates by adopting the extrapolation method employed by the district court in *Robles v. United States of America*, No. 84–3635 (D.D.C. Jan. 10, 1992). In *Robles*, the district court updated the *Laffey* matrix by adding $10 per hour to the 1988–89 hourly rate of $220 and to the hourly rates of each succeeding year. *See Robles*, slip op. at 16 & n. 7. Plaintiffs have followed the *Robles* approach, adding $10 raises to each year after 1988–89 to calculate a current (1992–93) rate of $260 per hour. (Pls.' Application, at 23.)

The U.S. Attorney's Office's matrix also awards counsel with 11–19 years of experience a rate of $260 per hour for 1992–93. The U.S. Attorney's Office extrapolates its

matrix by adding the Consumer Price Index increase for the Washington, D.C., metropolitan area to the prior year's rate, and rounding upwards if the sum is within $3 of the next $5 multiple. (*See* Appendix B, Methodology Note.) Given a Consumer Price Index rate of 3.4 percent, the U.S. Attorney's Office's matrix would award a 1992–93 rate of $260 per hour.

#### ii. *Ms. Delaney and Prof. Hager*

Plaintiffs' most up-to-date information on the rates of lawyers with Ms. Delaney's and Prof. Hager's 4–7 years of experience comes from the U.S. Attorney's Office matrix. The *Laffey* fee matrix charts fees only up to 1989.[12] (*See* Appendix A.) The U.S. Attorney's Office matrix, by contrast, charts fees up to 1992. (*See* Appendix B.) For 1991–92, which is the latest year reported in the U.S. Attorney's Office's matrix, the fee for lawyers of 4–7 years of experience is $165 per hour. Plaintiffs request only $160 per hour for the work of Ms. Delaney and Prof. Hager.

#### iii. *The Law Graduates*

If plaintiffs had requested the most current rate in this more current matrix, they could have claimed $125 per hour—the 1991–92 rate recorded in the U.S. Attorney's Office's matrix—for the work of their law graduates. Instead, plaintiffs have requested only $85 per hour for their law graduates' time. This court will assume that some factor apparent to plaintiffs justifies the modesty of this request. *Cf. Sierra Club v. E.P.A.*, 769 F.2d 796, 812 (D.C.Cir.1985).

Because plaintiffs' matrices stand as virtually unrefuted evidence, and because plaintiffs have employed rational methods of updating this evidence to calculate current market rates, this court will award plaintiffs the fees they have requested for Mr. Gaffney, Mr. Schember, Ms. Delaney, Prof. Hager, and the law graduates.

---

**12.** Although *Robles* updates the *Laffey* matrix's rates for lawyers with 11–19 years of experience, it does not update the rates for lawyers with 4–7 years of experience. *See Robles,* slip op. at 16.

## B. Law Students

The next issue this court must address is whether the time spent by law students working for plaintiffs' counsel on *Covington* is compensable under § 1988. For their work on *Covington*, the law students were paid not by salary, but by the promise of a fee contingent upon plaintiffs prevailing on the merits. The parties dispute whether § 1988 permits plaintiffs to claim fees for the time expended by law students who are paid by a contingent fee.

The reasonable hours expended by law students may be compensated under § 1988 only if it is the "prevailing practice" in the District of Columbia's legal market to bill paying clients for such work. *Jenkins*, 491 U.S. at 287, 109 S.Ct. at 2471. Both parties agree that in the ordinary § 1988 case—that of a law firm that pays its law students a salary (even a below-market salary)—a law firm need only prove what the prevailing market rate is in order to collect that rate for its law students. *See, e.g., In re Donovan*, 877 F.2d 982, 993, 997 (D.C.Cir.1989) (per curiam); *In re Olson*, 884 F.2d 1415, 1426 (D.C.Cir.1989) (awarding compensation for time spent by salaried law clerks). The parties disagree on whether this unusual case—that of lawyers who pay law students a contingent fee—differs from the ordinary case in degree or in kind.

Plaintiffs argue that it differs only in degree. According to plaintiffs, a contingent fee is like a salary (perhaps a below-market salary). A law student paid by contingent fee is thus just like a law student paid by salary. In either case, counsel need only establish the prevailing market rate for law students in order to recover it under § 1988. Plaintiffs' matrices, which show the prevailing market rates for law students' labor, meet that evidentiary burden.

Defendants, by contrast, argue that the present case differs in kind from the ordinary case. While defendants recognize that the time of *salaried* law students is commonly billed to paying clients, defendants argue that law students *paid by contingent fee* are

another matter entirely. Plaintiffs cannot simply assume that the prevailing practice in the District of Columbia is to bill the hours of law students who are paid by contingent fee in the same way that the hours of salaried law students are billed. Rather, plaintiffs must carry the additional burden of proving that law students paid by contingent fee are commonly billed to paying clients (as well as the ordinary burden of determining what that market value is). Because plaintiffs have failed to establish that it is the prevailing practice to bill paying clients for the work of law students paid by contingent fee, defendants argue that they are not liable for any of the hours expended by the law students.

■ Plaintiffs' theory is correct in this Circuit. In *Jordan v. United States Dept. of Justice*, 691 F.2d 514, 523–24 (D.C.Cir.1982), this Circuit found that unpaid law students are different only in degree, not kind, from paid law students for the purposes of fee-shifting statutes. In *Jordan*, the court held that the work of unpaid law students should be compensated at prevailing market rates, rejecting the argument that the law students could recover only the cost of their labor (which is zero when law students work for free). In a decision crucial to this case, the *Jordan* court found that the plaintiffs' sole burden was to establish the "market value of [the law students'] services"; the court did not impose upon plaintiffs the additional burden of proving that the prevailing practice is to bill paying clients for the labor of unpaid law students. *Jordan*, 691 F.2d at 524. Because this Circuit has declined to impose that additional burden on plaintiffs who seek compensation for unpaid law students, this court declines to impose that additional burden on plaintiffs who seek compensation for law students paid by contingent fee.[13]

Since plaintiffs' matrices have carried plaintiffs' sole burden of establishing the prevailing market rates for law students in the District of Columbia, plaintiffs may collect

---

13. Although *Jordan* predates by years the *Jenkins* Court's requirement that plaintiffs prove that it is the prevailing practice to bill paying clients for

law student labor, nothing in *Jenkins* alters the *Jordan* court's view of unpaid and paid law students as different only in kind not degree.

the prevailing market rate for their law students' time.

Plaintiffs seek compensation for the 347.20 hours [14] of law student time at the prevailing market rate for law student work on complicated federal litigation, which they claim to be $70 per hour. Plaintiffs' most current data evidencing the prevailing market rate of law students comes from the U.S. Attorney's fee matrix. (As discussed above, the *Laffey* fee matrix charts fees only up to 1989; the U.S. Attorney's Office's matrix charts fees up to 1992.). Because plaintiffs' evidence is practically unrefuted, and because their fee request is based upon their most current data, this court will award plaintiffs the $70 per hour rate requested for the work of their law students.

### C. Current Rates

To compensate for the delay in the payment of their attorney's fees, plaintiffs ask that the final fee award—both for counsel and for the law students who worked on the case—be based on current rates rather than historic rates. That is, plaintiffs request prevailing market rates earned by lawyers today, rather than the rates that prevailed in the market when counsel actually worked on *Covington*.

■■■ This court clearly has the authority to grant plaintiffs either current or historic rates. Ordinarily, district courts should award historic rates by "simply match[ing] the billing rate governing a particular period to the hours reasonably expended that period." *Laffey*, 746 F.2d at 20 n. 104. However, to roughly compensate for delay in payment, a district court has the authority to award current market rates instead of historic market rates,[15] so long as the use of current instead of historic rates would not over-compensate counsel, "generating a windfall for the plaintiff's attorneys."[16]

Generally, to collect current rates plaintiffs must show that the delay in fee payment has produced some degree of hardship such that an award of current rates does not produce a windfall. However, in the present case defendants appear to have conceded plaintiffs' right to receive current rates for work done years ago. By failing to request production for this court of an annual breakdown of the number of hours that plaintiffs' counsel expended on *Covington*, defendants have made it impossible for this court to award historic rates. It is impossible to compute the fee counsel would have earned in the market each year—*i.e.*, the historic rates—without knowing how many hours plaintiffs' counsel expended in each year of the *Covington* litigation. Defendants could have discovered this information from plaintiffs by filing with this court a motion for leave to conduct discovery necessary to file its brief in opposition. By failing to provide this court with the information necessary for it to award historic rates, defendants appear to have conceded plaintiffs' right to current rates. Accordingly, this court will award plaintiffs current rates for all hours expended on the underlying litigation of *Covington*.

### D. Fees for Fee Litigation

The final issue before this court is whether plaintiffs' counsel are entitled to fees for litigating this fee petition. Plaintiffs have provided detailed records for Mr. Gaffney (Gaffney Decl. at App.Ex. D (claiming 62.7 hours)); Mr. Schember (Schember Decl. at ¶ 12 (claiming 12.1 hours)); and a law clerk (Gaffney Decl. at App.Ex. E (claiming 27.6 hours)) recording time reasonably spent on this fee litigation as of the date of the motion for fees.

■■■ Plaintiffs are entitled to compensation from defendants for all hours reasonably expended on this fee petition. *See Sierra Club*, 769 F.2d at 811; *Environmental Defense Fund v. EPA*, 672 F.2d 42, 62 (D.C.Cir.1982). Because defendants have conceded the reasonableness of the hours claimed in the origi-

---

**14.** The parties have already stipulated as to the number of hours the law students reasonably spent on this case.

**15.** *See, e.g., Jenkins,* 491 U.S. at 284, 109 S.Ct. at 2469; *Laffey*, 746 F.2d at 20 n. 104.

**16.** *Murray v. Weinberger,* 741 F.2d 1423, 1433 (D.C.Cir.1984).

nal motion, and because plaintiffs' counsels' declarations regarding these claimed hours are sufficiently detailed, this court will not independently scrutinize the hours claimed. Instead, this court will assume that when the number of hours is uncontested, some factor apparent to the parties justifies the number of hours counsel claims. *See Sierra Club*, 769 F.2d at 812.

Although defendants concede that the claimed time expended on this fee litigation is a reasonable amount, defendants dispute their liability for that time. Defendants contend—without citing any statutory provision or caselaw in support—that if plaintiffs do not "prevail[ ]" on their request for attorney's fees, plaintiffs may not be awarded attorney's fees for the fee litigation. Even under defendants' novel theory, plaintiffs still could collect fees for this fee litigation. Plaintiffs are indeed prevailing on their motion for fees *per* this memorandum opinion. Plaintiffs' counsel are entitled to a reasonable hourly rate for all the hours they claim they have reasonably expended on the fee litigation itself.

This court also grants plaintiffs leave to submit a supplemental motion to request compensation for reasonable time spent on this fee litigation since the filing of the original motion.

## III. CONCLUSION

For litigating the merits of *Covington*, plaintiffs are awarded fees in accordance with the chart below:

| Attorney | Hours | Prevailing Market Rate | Amount |
|---|---|---|---|
| Schember | 930.64 | $260 per hour | $241,966.40 |
| Gaffney | 65.70 | $260 per hour | $ 17,082.00 |
| Delaney | 303.11 | $160 per hour | $ 48,497.60 |
| Hager | 38.50 | $160 per hour | $ 6,160.00 |
| Law Graduates | 43.85 | $ 85 per hour | $ 3,727.25 |
| Law Students | 347.20 | $ 70 per hour | $ 24,304.00 |
| Total Fees for Merits | | | $341,737.25 |

For litigating this fee petition, plaintiffs are awarded fees in accordance with the chart below (subject to change upon the filing of a supplemental motion requesting compensation for reasonable time spent on this fee litigation since the filing of the original motion):

| Attorney | Hours | Prevailing Market Rate | Amount |
|---|---|---|---|
| Schember | 12.1 | $260 per hour | $ 3,146.00 |
| Gaffney | 62.7 | $260 per hour | $16,302.00 |
| Law Clerk | 27.6 | $ 70 per hour | $ 1,932.00 |
| Fees for Fee Litigation | | | $21,380.00 |

In sum, plaintiffs are awarded attorney's fees as follows:

| | |
|---|---|
| Total Fees for Merits | $341,737.25 |
| Less Interim Fee Award | ($194,868.00) |
| Fees for Fee Litigation [17] | $21,380.00 |
| Total Fees to be Awarded by this order | $168,249.25 |

Plaintiffs are hereby awarded $168,249.25 in attorney's fees.

A separate order shall issue this date.

17. This portion of the award may be amended after the filing of a supplemental motion requesting compensation for reasonable time spent on this fee litigation since the filing of the original motion.

*ORDER*

This matter comes before this court on plaintiffs' motion for an award of attorney's fees under 42 U.S.C. § 1988, the Civil Rights Attorney's Fee Awards Act of 1976. Upon consideration of the pleadings and evidence of both parties, it is hereby, for the reasons set forth in an accompanying memorandum opinion,

ORDERED that plaintiffs' motion for an award of attorney's fees is granted, and it is further

ORDERED that defendants shall, within forty-five days of the date of this order, pay plaintiffs attorney's fees in the amount of $168,249.25, and it is further

ORDERED that plaintiffs shall, within twenty days from the date of this order, file a supplemental motion for award of attorney's fees incurred since the date of plaintiffs' motion for an award of attorney's fees and for expenses, unless a settlement between the parties before then obviates the need to file such a supplemental motion.

SO ORDERED.

## APPENDIX A
### LAFFEY MATRIX

| | YEARS [1] | | | | | | | | |
| | (Hourly Rates) | | | | | | | | |
| | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 | 1988 |
| EXPERIENCE OF ATTORNEY | –81 | –82 | –83 | –84 | –85 | –86 | –87 | –88 | –89 |
| Very experienced federal litigators (20+ years): | $165 | $175 | $190 | $200 | $210 | $225 | $240 | $255 | $265 |
| Experienced federal litigators (11th thru 19th years): | $140 | $150 | $160 | $170 | $180 | $190 | $200 | $210 | $220 |
| Experienced litigator (8th thru 10th years): | $115 | $125 | $135 | $145 | $155 | $165 | $175 | $185 | $195 |
| Senior associates (4th thru 7th years): | $ 95 | $100 | $105 | $110 | $115 | $120 | $125 | $130 | $135 |
| Junior associates (1st thru 3rd years): | $ 70 | $ 75 | $ 80 | $ 85 | $ 90 | $ 95 | $100 | $105 | $110 |
| Paralegals/Law Clerks: | $ 30 | $ 35 | $ 40 | $ 45 | $ 50 | $ 55 | $ 55 | $ 60 | $ 60 |

[1] June 1—May 31

### APPENDIX B
### U.S. ATTORNEY'S
### OFFICE'S MATRIX

Years (Rate for June 1 – May 31, based on prior year's CPI)

| EXPERIENCE | 80–81 | 81–82 | 82–83 | 83–84 | 84–85 | 85–86 |
|---|---|---|---|---|---|---|
| 20+ Years | 165 | 175 | 185 | 195 | 205 | 210 |
| 11–19 Years | 140 | 150 | 160 | 170 | 180 | 185 |
| 8–10 Years | 120 | 125 | 130 | 135 | 140 | 145 |
| 4–7 Years | 95 | 100 | 105 | 110 | 115 | 120 |
| 1–3 Years | 70 | 75 | 80 | 85 | 90 | 95 |
| Paralegals/ Law Clerks | 30 | 35 | 35 | 40 | 40 | 45 |

| EXPERIENCE | 86–87 | 87–88 | 88–89 | 89–90 | 90–91 | 91–92 |
|---|---|---|---|---|---|---|
| 20+ Years | 220 | 230 | 245 | 260 | 275 | 285 |
| 11–19 Years | 190 | 200 | 210 | 225 | 240 | 250 |
| 8–10 Years | 150 | 155 | 165 | 175 | 185 | 195 |
| 4–7 Years | 125 | 130 | 140 | 150 | 160 | 165 |
| 1–3 Years | 100 | 105 | 110 | 115 | 120 | 125 |
| Paralegals/ Law Clerks | 50 | 55 | 60 | 65 | 70 | 75 |

Methodology note: *Laffey*, decided in 1982, set fees for work done in 1981–82. The fees in this matrix are calculated by adding Consumer Price Index (Washington, D.C. Metropolitan Area) increase to the applicable *Laffey* rate for the prior year, then rounding (up, if within $3 of the next multiple of $5).